## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
--------------------------------------------------  )
                                                    )
MICHAEL WILLIS,                                     )
                                                    )
            Plaintiff,                              )
                                                    )
    v.                                              )
                                                    )      Civil Action No. 13-2061 (RBW)
DISTRICT OF COLUMBIA,                               )
                                                    )      FILED UNDER SEAL
            Defendant.                              )
                                                    )
--------------------------------------------------  )
```

## MEMORANDUM OPINION

The plaintiff, Michael Willis, an African-American, brings this action against the

defendant, the District of Columbia (the "District"), asserting claims of employment

discrimination based on his race, retaliation, and hostile work environment under the District of

Columbia Human Rights Act, D.C. Code Ann. §§ 21402.11; 2-1402.61 (West 2001), and Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2, e-3 (2012).  See

generally Complaint ("Compl.").  Currently before the Court is the defendant's Motion for

Summary Judgment ("Def.'s Mot."), brought pursuant to Federal Rule of Civil Procedure 56(c).

Upon careful consideration of the parties' submissions, the Court concludes that it must grant the

defendant's motion.[1]

## I.      BACKGROUND

In June 2005, the plaintiff was transferred to the Training Academy of the District of

Columbia Fire and Emergency Medical Services Department (the "Department"), "where he held

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of the District of Columbia's Motion for Summary Judgment ("Def.'s Mem."); (2) Plaintiff Michael Willis' Opposition to the Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); (3) Plaintiff Michael Willis' Memorandum in Support of His Opposition to the Defendant's Motion for Summary Judgment ("Pl.'s Mem."); (4) the Plaintiff['s] Statement of Material Facts Not in Dispute ("Pl.'s Facts"); (5) the defendant's Statement of Material Facts Not in Dispute ("Def.'s Facts"); and (6) the Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute ("Pl.'s Resp.").

the position of Training Director," Def.'s Facts ¶ 2; Pl.'s Resp. ¶ 2, while also being promoted to

the rank of Deputy Fire Chief for the Department.  Pl.'s Opp'n at 8.  "On or about March 30,

2006, Sergeant Theresa Shanklin submitted a Special Report" to Fire Chief Adrian Thompson,

reporting that an Emergency Medical Services ("EMS") instructor distributed advanced copies of

a test that would be taken the following day by an Emergency Medical Technician ("EMT")

class, in violation of Training Academy Policies and Procedures.  Def.'s Facts ¶¶ 3, 4; Pl.'s

Resp. ¶¶ 3, 4; Pl.'s Opp'n, ECF No. 24–3, Exhibit ("Ex.") 2 (March 31, 2006 Memorandum to

Fire Chief Adrian Thompson ("March 31, 2006 Memorandum")) at 1.[2]  Lieutenant Marie

Rosich-Sisk issued the first endorsement of the Special Report and recommended "that the

matter be further investigated."  Def.'s Facts ¶ 5; Pl.'s Resp. ¶ 5.  On April 7, 2006, Captain

Sheila Watson "issued a second endorsement of the Special Report," indicating "that the matter

[had been] investigated" and that the plaintiff had cancelled the violating EMS instructor's detail

effective immediately.  Def.'s Facts ¶¶ 6, 7; Pl.'s Resp. ¶¶ 6, 7.  The plaintiff "endorsed Captain

Watson's endorsement and concurred with the findings."  Def.'s Facts ¶ 8; Pl.'s Resp. ¶ 8.

"Battalion Chief Craig Baker[] issued the third endorsement [of the] . . . Special Report,"

indicating that the plaintiff and Captain Watson had investigated the violation, and forwarded the

report to Assistant Fire Chief William Fitzgerald for final endorsement.  Def.'s Facts ¶¶ 9, 10;

Pl.'s Resp. ¶¶ 9, 10.  "Chief Fitzgerald issued the final endorsement" of the Special Report and

approved the corrective action taken by the plaintiff and Captain Watson.  Def.'s Facts ¶ 11; Pl.'s

Resp. ¶ 11.

On June 22, 2006, the "[p]laintiff was cited for [conducting] an incomplete investigation

of the EM[S]" instructor's violation.  Def.'s Facts ¶ 14; Pl.'s Resp. ¶ 14.  Subsequently, the

---

[2] In referencing the parties' exhibits, the Court will use the automatically generated electronic court filing ("ECF") page numbers for pincites.

plaintiff was suspended for three days, transferred from the Training Academy to the Office of

Risk Management, and proposed for demotion for failure to maintain EMT certifications.  Def.'s

Facts ¶¶ 15–17; Pl.'s Resp. ¶¶ 15–17.  The proposed demotion was later rescinded and never

imposed.  Def.'s Facts ¶ 18; Pl.'s Resp. ¶ 18.  The plaintiff disputes the defendant's contention

that his investigation was incomplete, asserting that his investigation was "thorough and

complete" and that his endorsement of the special report was "entirely consistent with the

Department's policy on the investigation of misconduct."  Pl.'s Facts ¶¶ 2, 3.

On December 4, 2006, the plaintiff filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") and cross-filed the same charge with the

District of Columbia Office of Human Rights, alleging that he was transferred to the Office of

Risk Management, replaced by a less qualified candidate, and falsely accused of conducting an

incomplete investigation, because of his race.  Def.'s Facts ¶¶ 24–27; Pl.'s Resp. ¶¶ 24–27.  On

May 4, 2007, the plaintiff amended his charge of discrimination, alleging that he was retaliated

against when he was transferred to "a lower status position" in the Office of Risk Management,

and received notice of the proposed demotion and suspension of his employment.  Def.'s Facts

¶¶ 29–31; Pl.'s Resp. ¶¶ 29–31.  On September 30, 2013, the EEOC issued its Dismissal and

Notice of Rights, disposing of the plaintiff's EEOC complaint.  Compl. ¶ 10.  Thereafter, on

December 27, 2013, the plaintiff filed this action, asserting claims of race discrimination (Count

I), retaliation (Count II), hostile work environment (Count III), violation of 42 U.S.C. § 1983

(Count IV), along with seeking equitable relief (Count V).  Def.'s Facts ¶ 33; Pl.'s Resp. ¶ 33.

On July 7, 2015, the plaintiff, in response to the defendant's first interrogatories, withdrew his §

1983 claim.  See Def.'s Mot., ECF No. 20–2, Ex. 6 (Plaintiff's Objections and Answers to

Defendant's First Interrogatories to Plaintiff) at 2; see also Def.'s Facts ¶ 34; Pl.'s Resp. ¶ 34.

## II.      STANDARD OF REVIEW

Courts will grant a motion for summary judgment under Federal Rule of Civil Procedure 56(c) if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

The non-moving party, however, cannot rely on "'mere allegations or denials.'" Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248), and "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted). Simply put, "conclusory allegations unsupported by factual data will not create a triable issue of fact." Pub. Citizen Health Research Grp. v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation marks and citations omitted). Rather, to withstand a properly supported motion for summary judgment, the non-moving party must set out "specific facts showing a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "[T]here is no [genuine] issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249 (citation omitted), and if the Court concludes that the evidence adduced by the non-moving party "is merely colorable . . . or is not significantly probative," id. (citations omitted), or if the non-moving party has otherwise "failed

to make a sufficient showing on an essential element of h[is] case with respect to which []he has the burden of proof," Celotex Corp., 477 U.S. at 323, then the moving party is entitled to summary judgment.

## III.    ANALYSIS

### A. The Applicability of D.C. Code § 12-309's Notice Requirement to the Plaintiff's District of Columbia Human Rights Act Claims

The defendant argues that the plaintiff's District of Columbia Human Rights Act (the "Human Rights Act") claims fail as a matter of law because the plaintiff did not comply with the mandatory notice requirements of District of Columbia Code § 12-309. Def.'s Mot. at 2; Def.'s Mem. at 20. In response, the plaintiff asserts that "following the exhaustion of his administrative remedies, [he] timely submitted a Notice of Claim . . . , dated July 2, 2015." Pl.'s Opp'n at 26.

Under section 12-309,

> an action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.

D.C. Code § 12-309(a) (2015). Because "[t]he purpose of this requirement is to 'provide an early warning to District of Columbia officials regarding litigation likely to occur in the future,'" Singh v. District of Columbia, 881 F. Supp. 2d 76, 83 (D.D.C. 2012) (quoting Johnson v. District of Columbia, 572 F. Supp. 2d 94, 111 (D.D.C. 2008)), and "'because [the notice requirement] represents a waiver of sovereign immunity,'" id. (quoting Faison v. District of Columbia, 664 F. Supp. 2d 59, 68 (D.D.C. 2009)), the notice "requirement is a prerequisite to filing suit against the District," id. ("It . . . 'permit[s] the District to conduct an early investigation of the facts and circumstances surrounding such claims.'" (quoting Mazloum v. D.C. Metro. Police Dep't, 522 F. Supp. 2d 24, 49 (D.D.C. 2007))). However, as a result of a 2015 amendment, this notice

5

requirement does "not apply to claims brought under [the Human Rights Act]."  § 12-309(b).

Despite the enactment of the 2015 amendment of section 12-309, the District, in its reply brief, argues that "[w]hile [section] 12-309 no longer applies to claims filed under the [Human Rights Act], there is no showing that this statute has retroactive effect," and while "[t]his argument was not raised by [the p]laintiff in his opposition," the "plaintiff should be required to satisfy the statutory notice under [section] 12-309" because his "claim[] pre-exist[ed] May 2, 2015, the effective date of this amendment to the [Human Rights Act]," eliminating the statutory notice requirement for such claims.  Def.'s Reply at 13.

Under District of Columbia law, "'[a]s a general rule, statutes are to be construed as having only a prospective operation, unless there is a clear legislative showing that they are to be given a retroactive or retrospective effect.'"  Payne v. D.C. Gov't, 722 F.3d 345, 352 (D.C. Cir. 2013) (quoting Wolf v. D.C. Rental Accommodations Comm'n, 414 A.2d 878, 880 n.8 (D.C. 1980).  In other words, "'retroactive applications of legislation are not to be presumed absent express legislative language or other clear implication that such retroactivity was intended.'"  Id. (quoting Redman v. Potomac Place Assocs., LLC, 972 A.2d 316, 319 n.4 (D.C. 2009).  However, "[t]he D.C. Court of Appeals has instructed that amendments to statutory procedural requirements 'are generally held to apply to pending cases,' but that a requirement is not merely procedural if applying the amendment would 'impair vested rights.'"  Williams v. Johnson, 776 F.3d 865, 873 (D.C. Cir. 2015) (quoting Montgomery v. District of Columbia, 598 A.2d 162, 166 (1991)).

Whether the 2015 amendment to the Human Rights Act removing the notice requirement of § 12-309 has retroactive application appears to be a question of first impression, as the Court has been unable to identify other cases that address this question.  But, the District of Columbia

Circuit addressed an analogous question in <u>Williams v. Johnson</u>, 776 F.3d 865 (D.C. Cir. 2015), which the Court finds particularly instructive here.  In <u>Williams</u>, the District, on appeal, argued that the plaintiff "should not have been able to bring her claim for constructive discharge because she did not satisfy the requirement of timely notice codified at [section] 12-309 of the D.C. Code," because at the time of the plaintiff's resignation, and even while the case was in the pretrial stage, the notice requirement applied to claims brought under the District of Columbia Whistleblower Protection Act.  776 F.3d at 873.  Additionally, the District argued that the notice requirement "[was] not merely procedural," <u>id.</u>, and "because its sovereign immunity is a substantive right, the amendment cannot be applied retroactively to its detriment," <u>id.</u> at 874.  However, the Circuit concluded that the notice requirement was procedural because "removing the [section] 12-309 requirement alters not the District's waiver of sovereign immunity but only the steps necessary for a plaintiff to invoke the waiver."  <u>Id.</u> ("Rather, we think abolishing [section] 12-309 as a condition precedent for a [Whistleblower Protection Act] claim means the Council was willing to submit the District to suit by whistleblowers without retaining the litigation advantage of early notice."); <u>see also</u> <u>id.</u> ("Removing a condition precedent (here, notice) to the waiver of a substantive right (here, sovereign immunity) is not the same as abridging the substantive right itself; all procedural requirements are ultimately conditions precedents to some substantive right, else they would be requirements without consequence.").  The Circuit therefore held that the amendment abolishing section 12-309's notice requirements for claims brought under the District of Columbia Whistleblower Protection Act applied retroactively, <u>id.</u> at 875 ("The Council's determination that the procedural costs in a case such as this are an acceptable price to pay for the increased protection of whistleblowers divested the District of its former right to early notice.").

7

In this case, the plaintiff, at the time of the filing of this action, had not timely complied

with the notice requirement as then required by section 12-309.  See Pl.'s Opp'n, ECF No. 24–

20, Ex. 19 (Supplemental Notice of Claim Under D.C. Code-Section 12-309, dated July 2, 2015)

(sending written notice of his claims to the Mayor of the District on July 2, 2015, approximately

nine years after his alleged injury and one and a half years after this case was filed on December

23, 2013).  Thus, prior to the amendment, the plaintiff would have been precluded from pursuing

his claims under the Human Rights Act.  But, because the amendment removing the statutory

notice requirement from the Human Rights Act is procedural, and not substantive, as it did not

"impair vested rights," see Williams, 776 F.3d at 874 ("In the statutory scheme before us, there

was both a statute of limitations and a notice-of-claims requirement; obviously, therefore, the

District's notice requirement was neither needed nor intended to give the District security in

being free from suit."), the plaintiff "benefits from the amendment removing the requirement and

is not barred from bringing [his Human Rights Act] claim[s] even though [he] did not formally

notify the District of th[ose] claim[s] within six months of [the alleged adverse employment

actions]," id. at 875.  Therefore, the plaintiff may proceed with his claims under the Human

Rights Act, as they are not procedurally barred for failing to provide timely notice.  Accordingly,

the District's demand for summary judgment based on the plaintiff's non-compliance with the

now rescinded notice requirements of section 12-309 is denied.

## B.   The Plaintiff's Title VII and Human Rights Act Claims

### 1.   Exhaustion of Administrative Remedies Under Title VII

"[A] Title VII complainant[] must timely exhaust [his] administrative remedies before

bringing [his] claims to court."  Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (citations

omitted).  To do so, "a complainant must first file a charge with the [EEOC] . . . 'within three

hundred days after the alleged unlawful employment practice occurred' if the employee first

initiated proceedings with a "State or local agency with authority to grant or seek relief from

such practice.'" Rashad v. Wash. Metro. Area Transit Auth., 945 F. Supp. 2d 152, 165 (D.D.C.

2013) (quoting 42 U.S.C. § 2000e-5(e)(1)).  Importantly, "[e]ach incident of discrimination and

each retaliatory adverse employment decision constitutes a separate actionable 'unlawful

employment practice'" and "starts a new clock for filing charges alleging that act." Nat'l R.R.

Passenger Corp. v. Morgan, 536 U.S. 101, 113–14 (2002).  Thus "[t]o be actionable, a discrete

act—an event that 'takes place at a particular point in time'—must occur within the filing

period," Dickens v. Dep't of Consumer & Regulatory Affairs, 298 F. App'x 2, 3 (D.C. Cir. 2008)

(quoting Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007), superseded by statute

Pub. L. No. 111–2, 123 Stat. 5 (2009)), and "discrete discriminatory acts are not actionable if

time barred, even when they are related to acts alleged in timely filed charges," Morgan, 536

U.S. at 113.

Here, the defendant argues that the plaintiff failed to exhaust all of his administrative

remedies with respect to his Title VII discrimination, retaliation, and hostile work environment

claims.[3]  Def.'s Mem. at 7–10.  The Court will address each of the defendant's arguments in turn.

### a.    The Plaintiff's Discrimination Claims

The District argues that some of plaintiff's race discrimination claims are barred because

he did not allege those discrete acts in his charge of discrimination submitted to the EEOC.

---

[3] Similar to Title VII, "the District of Columbia Court of Appeals has held that a District of Columbia employee must exhaust administrative remedies prior to seeking relief through the courts." Elhusseini v. Compass Grp. USA, Inc., 578 F. Supp. 2d 6, 17 (D.D.C. 2008) (citing Newman v. District of Columbia, 518 A.2d 698 (D.C. 1986); see also Williams v. District of Columbia, 467 A.2d 140 (D.C. 1983).  Therefore, the plaintiff here, as a former District employee, must have exhausted the available administrative remedies prior to pursuing these causes of action under the Human Rights Act.  However, because the plaintiff cross-filed his EEOC charge of discrimination with the District's Office of Human Rights, the "'worksharing agreement [between the two offices] relieved the plaintiff of the burden of exhausting his remedies with the state agency.'" Bowie v. Gonzales, 433 F. Supp. 2d 24, 34 (D.D.C. 2006) (quoting Fowler v. District of Columbia, 122 F. Supp. 2d 37, 42 (D.D.C. 2000)).

Def.'s Mem. at 8. Specifically, the defendant asserts that "the [p]laintiff should only be allowed to proceed on his claim that he was transferred because of his race and replaced by a Caucasian employee," Def.'s Reply at 4, due to the plaintiff's failure to allege in his charge of discrimination filed with the EEOC, "(1) . . . that a Caucasian Battalion Fire Chief[,] Craig Baker, who assisted in the investigation conducted by the plaintiff, was not issued any discipline for the alleged incomplete investigation, and (2) that the decision to discipline him with a [twenty-four] hour suspension was based on his race." Def.'s Mem. at 9. The plaintiff responds that "the allegation that Chief Baker, who assisted in the investigation of the cheating scandal, was not issued any discipline for the alleged incomplete investigation . . . is appropriately before this Court as comparator evidence," rather than as a discrete act of discrimination as defined by Morgan. Pl.'s Opp'n at 22; see also id. at 21.

Here, there is no real dispute that the "the allegation that Chief Baker, who assisted in the investigation of the cheating scandal, was not issued any discipline for the alleged incomplete investigation" is not a "discrete act"[4] of discrimination as to the plaintiff. See Pl.'s Opp'n at 22. The plaintiff is correct, however, that he may use this allegation as comparator evidence as a basis for raising an inference of discrimination. See Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 301–02 (D.C. Cir. 2015) (holding that "[a] plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other

---

[4] For purposes of Title VII race-based employment discrimination claims, a discrete act is a "'single occurrence' that takes place at a particular point in time" and forms the basis for an "employment practice." Ledbetter, 550 U.S. at 628 (citing Morgan, 536 U.S. at 110–11). As illustrations, the Supreme Court has identified "'termination, failure to promote, denial of transfer, [and] refusal to hire' as examples of such 'discrete' acts." Id. "Discrete acts also include an employee's claims that [he] was wrongfully suspended from work, denied training, or falsely accused of a workplace infraction." Arnold v. Jewell, 6 F. Supp. 3d 101, 110 (D.D.C. 2013) (citing Morgan, 536 U.S. at 114). But, in accordance with the statutory language of Title VII, the discrete discriminatory act forming the basis of an alleged unlawful employment practice must be directed "against [the] individual" who seeks to challenge an alleged unlawful employment practice. 42 U.S.C. § 2000e-2. Consequently, "the allegation that Chief Baker, who assisted in the investigation of the cheating scandal, was not issued any discipline for the alleged incomplete investigation" is an employment action taken against Battalion Chief Baker and not the plaintiff. Therefore, this allegation is not an actionable "discrete act" against the plaintiff, as understood in the Title VII race discrimination context.

employees of a different race . . . more favorably in the same factual circumstances.'" (quoting Brady v. Office of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008))).

On the other hand, "the decision to discipline [the plaintiff] with a [twenty-four] hour suspension was based on his race" is a discrete act within the meaning of Title VII.  However, in his opposition, the plaintiff failed to address the District's argument that his raced based discrimination claim "related to the decision to discipline him with a [twenty-four] hour suspension was not fully exhausted." Def.'s Reply at 4; see generally Pl.'s Opp'n.  Accordingly, the Court will treat the District's position regarding this alleged, discrete discriminatory act as conceded, and therefore, the plaintiff is barred from pursuing claims based on this discrete act. See, e.g. Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (Walton, J.) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citations omitted)), aff'd 98 F. App'x 8 (D.C. Cir. 2004).  Accordingly, the Court will grant summary judgment in favor of the District with respect to the alleged discrete act of discrimination regarding the decision to discipline the plaintiff with a twenty-four hour suspension, and therefore, the only discrete acts that are actionable and upon which the plaintiff may proceed based on his race discrimination claim is his transfer to a purportedly undesirable position followed by his replacement with a Caucasian employee.

### b.   The Plaintiff's Retaliation Claims

The District next argues that the plaintiff's retaliation claim is time barred because the alleged retaliatory acts that form the basis for this claim occurred more than 300 days before the plaintiff amended his EEOC charge of discrimination to include the retaliation claim.  Def.'s

Mem. at 9. The plaintiff counters that the operative date for the running of the statute of

limitations to file a retaliation claim with the EEOC for alleged retaliatory acts of suspension or

termination is the date the suspension or termination was imposed, not the date when the plaintiff

learned of the potential suspension or termination, and therefore, because the plaintiff's

suspension falls within the 300 day time period, his retaliation claim is timely. Pl.'s Opp'n at 23.

And, even "[t]hough th[e District of Columbia] Court [of Appeals] has previously held that the

operative date for a formal termination is the date the employee learned of the potential

termination, Stephenson v. American Dental Association, 789 A.2d 1248, 1249–52 (D.C. 2002),

[the plaintiff] encourage[s] the court to adopt a more enlightened view and join the plethora of

courts holding that the actual date for when the harm occurs is the effective date of the act

proposed." Id. (collecting cases from surrounding jurisdictions). The Court, however, agrees

with the District and does not find it appropriate at this juncture to deviate from settled case law

in this jurisdiction.

   "Under D.C. and federal case law, a plaintiff is [suspended] from employment when he

receives 'final, unequivocal, and definite' notice of [his] [suspension], even if the effective date

occurs later." Leftwich v. Gallaudet Univ., 878 F. Supp. 2d 81, 96 (D.D.C. 2012); Gordon v.

Office of the Architect of the Capitol, 928 F. Supp. 2d 196, 204 (D.D.C. 2013) (holding that Title

VII's notification rule directs that "the limitations period begins to run on the date" that a given

employment decision is "made and communicated to [the employee]."); Fortune v. Holder, 767

F. Supp. 2d 116, 122 (D.D.C. 2011) ("[I]t is knowledge of the adverse employment decision

itself that triggers the running of the statute of limitations."); Cesarano v. Reed Smith, LLP, 990

A.2d 455, 465 (D.C. 2010); Barrett v. Covington & Burling, LLP, 979 A.2d 1239, 1253 (D.C.

2009). This is so because suspension occurs at "the time of the [retaliatory] act, not [at] the point

at which the <u>consequences</u> of the act become painful." <u>Chardon v. Fernandez</u>, 454 U.S. 6, 8

(1981) ("Mere continuity of employment, without more, is insufficient to prolong the life of a

cause of action for employment discrimination." (quoting <u>Delaware State College v. Ricks</u>, 449

U.S. 250, 257 (1980))); <u>see also</u> <u>Sharma v. District of Columbia</u>, 791 F. Supp. 2d 207, 214

(D.D.C. 2011) (citing <u>Stephenson</u>, 789 A.2d at 1250).

    In this case, the plaintiff's retaliation claim was not timely exhausted because the alleged

retaliatory acts occurred outside of the 300-day statutory time period allotted to timely file a

charge for each discrete retaliatory act with the EEOC.  In his amended charge of discrimination

submitted to the EEOC, which the EEOC received on May 4, 2007,[5] the plaintiff asserts that "on

[June 22, 2006], [he] was further retaliated against by being informed that [he] would be

suspended from employment and by being transferred as a Deputy Fire Chief to a lower status

position in the Risk Management Division," and that on the following day, he was "further

retaliated against" when he was issued "a written notice that [he] would be demoted."[6]  Pl.'s

Opp'n, ECF No. 24–19, Ex. 18 (Statement Amending EEOC Charge of Discrimination

("Amended EEOC Charge of Discrimination")).  The plaintiff was advised that he would serve

his suspension from July 6, 2006, through July 11, 2006, and in November 2006, he learned that

he would not be demoted.  <u>See id.</u>  Although the effects of the suspension and transfer decisions

were not scheduled to take effect until approximately two and a half weeks after the plaintiff

received notice of those adverse employment decisions, "the limitations period [began] to run on

---

[5] The parties do not dispute that the plaintiff raised his retaliation claim for the first time through his amended charge of discrimination dated on May 5, 2007, but stamped by the EEOC on May 4, 2007.  <u>See</u> Def.'s Mem. at 9; Pl.'s Opp'n at 22.

[6] In his opposition, the plaintiff again fails to address the District's argument that this claim was not timely exhausted, <u>see</u> Pl.'s Opp'n at 22–24, and as discussed above, <u>see</u> <u>supra</u> Part III.B.1.a, the Court therefore may treat the District's position as to this discrete act as conceded.  Nonetheless, this discrete act is not actionable because it occurred outside of the 300 day statutory time period required for the plaintiff to have filed a complaint with the EEOC regarding this discrete act.

the date" that the suspension and transfer decisions were "made and communicated to [the plaintiff]." Gordon, 928 F. Supp. 2d at 204. Therefore, because the plaintiff learned of the adverse employment decisions to suspend his employment and to transfer him to "a lower status position" on June 22, 2006, the plaintiff had until April 18, 2007, to timely file a retaliation claim with the EEOC based upon these adverse employment decisions. Consequently, because the plaintiff did not file a retaliation claim with the EEOC based on these alleged retaliatory acts until May 4, 2007, more than two weeks after the statutory limitations period lapsed, he is precluded from pursuing these retaliation claims because he failed to timely exhaust his administrative remedies with respect to them. Accordingly, the Court will grant summary judgment in favor of the District on the plaintiff's retaliation claims.

### c.  The Plaintiff's Hostile Work Environment Claims

The District also asserts that "[b]ecause [the p]laintiff did not file a charge of discrimination [with the EEOC] regarding his hostile work environment claim, he cannot proceed on this claim." Def.'s Mem. at 10. In response, the plaintiff contends that he was not required to specifically allege a hostile work environment claim in his charge of discrimination filed with the EEOC, see Pl.'s Opp'n at 25, and that his hostile work environment claim is timely because his "underlying submissions . . . are sufficiently precise to identify the aggrieved individual and agency and to describe generally the action(s) or practice(s) that form the basis of [his claim]" in accordance with the requirements of Title VII and EEOC regulations, id. at 24.

As noted earlier, Title VII's "administrative charge requirement serves the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision.'" Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting Laffey v. Nw. Airlines, Inc., 567 F.2d 429, 472 n.325 (D.C. Cir. 1976), cert. denied, 434 U.S.

1086 (1978)).  Thus, "[a] Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'"  Id. (quoting Cheek v. W. & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)).  Additionally, "it is true that the administrative charge requirement should not be construed to place a heavy technical burden on 'individuals untrained in negotiating procedural labyrinths,'" id. (quoting Loe v. Heckler, 768 F.2d 409, 417 (D.C. Cir. 1985)), but "it is also true that 'the requirement of some specificity in a charge is not a mere technicality,'" id. (quoting Rush v. McDonald's Corp., 966 F.2d 1104, 1111 (7th Cir. 1992)).  Therefore, "[w]hile a complainant need not describe every factual detail of [his] claim to satisfy the exhaustion requirement, [he] cannot file a 'vague or circumscribed EEOC charge' and expect that charge to 'satisfy the exhaustion requirement for claims it does not fairly embrace.'"  Craig v. District of Columbia, 74 F. Supp. 3d 349, 365 (D.D.C. 2014) (quoting Marshall v. Fed. Express Corp., 130 F.3d 1095, 1098 (D.C. Cir. 1997)).

Here, the plaintiff's EEOC charge fails to exhaust the plaintiff's hostile work environment claim because his "charge[s] not only lack[] the words 'hostile work environment,' but [they] also lack[] any factual allegations supporting such a claim."  Park, 71 F.3d at 908.  While the plaintiff is correct that he did not "need to use any magic words in [his EEOC] charge much less use the specific term 'hostile work environment' in order to properly exhaust such a claim," Whorton v. Wash. Metro. Area Transit Auth., 924 F. Supp. 2d 334, 348 (D.D.C. 2013) (citations omitted), he still must assert factual allegations that would support a hostile work environment claim, see Park, 71 F.3d at 909 ("Because [the plaintiff's] EEOC charge contained no claims or factual allegations that could reasonably be expected upon investigation to lead to a hostile work environment claim, we hold that she failed to exhaust her administrative remedies

for such a claim at the EEOC."). In his first charge of discrimination, the plaintiff alleged race

discrimination because he received notice on June 22, 2006, that he was being involuntarily

reassigned to "an undesirable position" and was being replaced by a Caucasian employee "who

[was] less qualified than [he was]." Pl.'s Opp'n, ECF No. 24–14, Ex. 13 (Charge of

Discrimination). Later, the plaintiff amended his charge of discrimination to include a retaliation

claim, alleging that on June 22, 2006, he also received notice that his employment would be

suspended, and on the following day, a written notice that he would be demoted.[7] Pl.'s Opp'n,

ECF No. 24–14, Ex. 18 (Amended EEOC Charge of Discrimination). These alleged discrete acts

of discrimination "are [not] adequately linked into a coherent hostile [work] environment claim,"

Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011), which "'is comprised of a series of

separate acts that collectively constitute one unlawful employment practice,'" because they do

not "'involve[] the same type of employment actions, occur[] relatively frequently, and [are]

perpetrated by the same managers,'" id. (quoting Morgan, 536 U.S. at 120–21). More

importantly, these allegations asserted in the plaintiff's charges of discrimination do not

sufficiently describe or make the District aware of "a pattern or practice" amounting to a hostile

work environment claim. See Ruffin v. Cong. Budget Office, 79 F. Supp. 3d 246, 249 (D.D.C.

2015) (noting that the plaintiff's factual allegations of "'disparate treatment and unfair

compensation because of race, sex, and reprisal' . . . would hardly provide fair notice that an

abusive working environment was being claimed"); see also Craig, 74 F. Supp. 3d 349, 365–66

(finding that the plaintiff's "timely administrative charge, which described only the harassing

---

[7] Although the Court previously concluded that these alleged discrete discriminatory acts were outside the statutory time period, these discrete acts fall within the ambit of a hostile work environment claim because "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside of the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered." Morgan, 536 U.S. at 117.

conduct and his response . . . was not sufficient to provide notice of her uncharged claim of

retaliatory hostile work environment."). Therefore, because the plaintiff failed to assert a hostile

work environment claim or plead factual allegations that could reasonably give rise to such a

claim in his EEOC charges, the plaintiff failed to exhaust his administrative remedies for his

hostile work environment claim, and therefore, the plaintiff's hostile work environment claim is

not actionable. Accordingly, the Court will grant the District's motion for summary judgment on

this claim.[8]

## 2.   The Merits of the Plaintiff's Race Based Discrimination Claims

"Title VII prohibits the federal government from discriminating in employment on

grounds of race . . . and from retaliating against employees for engaging in activity protected by

Title VII." Montgomery v. Chao, 546 F.3d 703, 706 (D.C. Cir. 2008) (internal citations

omitted). "The District of Columbia Human Rights Act uses almost precisely the same

language." Thomas v. District of Columbia, __ F. Supp. 3d __, __, 2016 WL 4991470, at *3

(D.D.C. Sept. 16, 2016) (citing D.C. Code § 2-1402.11). "When presented with a suit alleging

violations of each law, courts generally evaluate the claims under Title VII jurisprudence." Id.

(citing Carpenter v. Fed. Nat'l Mortg. Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (applying the

same test for violations of the Human Rights Act as would apply to violations of Title VII due to

the "substantial similarity" between the two laws)). Therefore, the Court will consider the

plaintiff's race discrimination claims under both statutes simultaneously.

In the absence of direct evidence of discrimination, as is the situation here, claims of

---

[8] The plaintiff further argues that "untimely discrete acts" and "the acts alleged within the Complaint not identified within the underlying EEO charges are not time-barred because those acts can be appropriately considered background information to support his timely made claim[s]." Pl.'s Opp'n at 22, 25. The plaintiff's position is correct because "evidence and allegations with respect to untimely acts of discrimination or retaliation may well be considered 'as background evidence in support of a timely claim.'" Ross v. U.S. Capitol Police, No. 14-CV-1400 (KBJ), 2016 WL 3659888, at *7 (D.D.C. June 30, 2016) (citing Morgan, 536 U.S. at 113).

employment discrimination under Title VII are analyzed under the three-part framework of

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Jackson v. Gonzales, 496 F.3d 703,

706 (D.C. Cir. 2007) (internal citation omitted). Under this framework, the plaintiff bears the

initial burden of establishing a prima facie case of discrimination, by providing proof of "(1)

membership in a protected group; (2) qualification for the job in question; (3) an adverse

employment action; and (4) circumstances that support an inference of discrimination."

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002) (internal citations omitted). If the

plaintiff establishes a prima facie case, "[t]he burden then must shift to the employer to articulate

some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell

Douglas, 411 U.S. at 802. Once the employer offers a legitimate, nondiscriminatory justification

for its action, "the McDonnell Douglas framework—with its presumptions and burdens—

disappears, and the sole remaining issue is discrimination vel non." Jackson, 496 F.3d at 707

(internal citation and quotation marks omitted). Thus, after the employer makes such a showing,

"the plaintiff must prove that a reasonable jury could infer that the employer's given explanation

was pretextual and that this pretext shielded discriminatory motives." Id. (internal citations

omitted).

      Where, as here, the defendant "has asserted a legitimate, nondiscriminatory reason" for

the adverse employment action in the context of a summary judgment motion, "the district court

need not—and should not—decide whether the plaintiff actually made out a prima facie case

under McDonnell Douglas." Brady, 520 F.3d at 494. Rather, the Court should evaluate only

whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory reason was not the actual reason and that the employer

intentionally discriminated against the employee on the basis of race." Evans v. Sebelius, 716

F.3d 617, 620 (D.C. Cir. 2013) (citation omitted). Typically, plaintiffs rely on one of two types of evidence to establish pretext: (1) "the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision," or (2) "the employee attempts to produce evidence suggesting that the employer treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual circumstances." Brady, 520 F.3d at 495 (internal citations omitted); see also Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137, 144 (D.C. Cir 2008) ("A plaintiff, who retains the burden of persuasion throughout, may show pretext in a number of ways, including by offering evidence of more favorable treatment of similarly situated persons who are not members of the protected class or that the employer is lying about the proffered justification." (citations omitted)). If the plaintiff fails to present such evidence, summary judgment must be granted for the employer. Paquin v. Fed. Nat'l Mortg. Ass'n, 119 F.3d 23, 27–28 (D.C. Cir. 1997). And conclusory allegations of discriminatory animus lacking any factual basis in the record are insufficient to defeat summary judgment. See Hussain v. Nicholson, 435 F.3d 359, 365 (D.C. Cir. 2006) (concluding that the district court properly disregarded the plaintiff's "evidence of religious animus" because it "consisted merely of conclusory allegations in his own affidavit" (internal citation omitted)).

Here, the plaintiff alleges that he was "reassigned to the Office of Risk Management, which is an undesirable position . . .[,] based upon an investigation that [he] had done . . . [and which] was falsely accused [of being] incomplete . . . [and that he] was replaced by Alfred Jefferys (White), who is less qualified." Pl.'s Opp'n, ECF No. 24–14, Ex. 13 (Charge of Discrimination). Additionally, the plaintiff argues that the District's proffered reason for his reassignment was pretextual because "deposition testimony and documentary evidence

19

affirmatively demonstrat[e] that [he] was treated less favorably tha[n] similarly situated comparators, who themselves did not receive any adverse actions as a result of the underlying incident." Pl.'s Opp'n at 13.  In response, the District contends that the "[p]laintiff has failed to offer any evidence to support his conclusory allegations that any action taken against him was because of his race;" that the evidence shows that others involved in the investigation were likewise disciplined; and that the "[p]laintiff was removed from the training academy . . . after (1) he did not complete a thorough investigation of an alleged cheating scandal; and (2) it was determined that he failed to maintain the EMT certifications at the academy.  Def.'s Mem. at 13–14.  The Court agrees with the District that the plaintiff has failed to offer sufficient evidence to demonstrate that the employment actions taken against him were because of his race.

To demonstrate pretext, the plaintiff primarily relies on the use of comparator evidence to show that the others similarly situated to himself, Battalion Chief Baker[9] and Assistant Fire Chief Fitzgerald, were not disciplined and that he received a three-day suspension, reassignment, and proposed demotion as discipline because of his race, similar to Captain Sheila Watson, who was also allegedly disciplined.  Specifically, the plaintiff notes that the record indicates that both Battalion Chief Baker and Assistant Fire Chief Fitzgerald "endorsed the Special Reports as the [p]laintiff had, and neither ordered any further investigation, beyond that which had occurred, just as [the p]laintiff."  Pl.'s Opp'n at 14; Def.'s Mot., ECF No. 20–3, Ex. 3 (Plaintiff's Objections and Answers to Defendant's First Interrogatories to Plaintiff) 13–14.  And, while the

---

[9] The District contends only that the "[p]laintiff has not shown that [Battalion] Chief Baker [is] a proper comparator" and that he is not a proper comparator because he "did not conduct the cheating investigation, unlike [the plaintiff]."  Def.'s Reply at 8.  While Battalion Chief Baker may hold one rank lower than the plaintiff, the General Order governing "cases requiring disciplinary action" applies the same disciplinary procedures to "firefighters above the rank of Captain."  Pl.'s Opp'n, ECF No. 24–6, Ex. 5 (General Order) at 2.  And, the General Order applies the same disciplinary reporting procedures, which cover Battalion Chief Baker and the plaintiff, and requires that reports of alleged infractions be forwarded through the proper chain of command.  Id. at 3–4.  The Court therefore finds that Battalion Chief Baker is a proper comparator because a "very close relationship between" the plaintiff and Battalion Chief Baker exists, Dudley v. Wash. Metro. Area Transit Auth., 924 F. Supp. 2d 141, 162 (D.D.C. 2013), for disciplinary reporting and procedures purposes.

record indicates that Assistant Fire Chief Fitzgerald was "orally reprimanded" by Fire Chief

Adrian Thompson, which the defendant purports to be a discretionary decision, see Pl.'s Opp'n,

ECF No. 24–5, Ex. 4 (Rule 30(b)(6) Deposition of Defendant ("Defendant's Deposition")) at

141, the record does not contain a policy that indicates that an oral reprimand constitutes

discipline or may be assessed as discipline upon the discretion of the Fire Chief, see Pl.'s Opp'n,

ECF No. 24–6, Ex. 5 (General Order) at 7 (noting the various disciplinary actions, which does

not include an oral reprimand as a disciplinary option).  Further, the record is devoid of any

concrete evidence that Battalion Chief Baker was actually disciplined, see Pl.'s Opp'n, ECF No.

24–5, Ex. 4 (Defendant's Deposition) at 139 (noting that the Department was not aware of

whether or not Battalion Chief Baker received any discipline), although the District asserts,

based on the plaintiff's deposition testimony, that Battalion Chief Baker was disciplined when he

was "transferred from the training academy as Assistant Training Director in and around June

2006," Def.'s Mem. at 14; see also Pl.'s Opp'n, ECF No. 24–5, Ex. 4 (Defendant's Deposition)

at 141 (affirming that if Chief Baker was disciplined that it would be on record).  Additionally,

other than the plaintiff's own assertion that Captain Watson was "involuntarily reassigned after

this [investigation], Pl.'s Opp'n at 7, 15 (claiming that "there exits record evidence indicating

that [Captain] Watson was transferred subsequent to the incident"), the record does not indicate

that Captain Watson was disciplined at all for her involvement in the cheating investigation,[10]

see Pl.'s Opp'n, ECF No. 24–5, Ex. 4 (Defendant's Deposition) at 140.

　　　　Furthermore, as noted earlier, the District argues that the plaintiff was disciplined because

---

[10] The plaintiff also cites a letter dated October 2007, wherein the Committee on Public Safety and the Judiciary requested that Fire Chief Dennis Rubin provide responses to "allegations of disparate handling of discipline based on race over many years" as support for his argument that he was excessively disciplined unlike his white counterparts as part of a systemic practice within the Department. Pl.'s Opp'n, ECF No. 24–16, Ex. 16 (Letter to Chief Rubin, dated October 17, 2007).  However, the plaintiff's reliance on this letter is of no avail because the letter does not indicate that there was a finding of "disparate handling of discipline based on race," but merely seeks responses to such allegations. Id.

(1) he did not complete a thorough investigation of the alleged cheating scandal, and (2) he failed

to maintain the EMT certifications at the academy.  For the plaintiff to have conducted a

thorough investigation, the District, through deposition testimony, asserts that the plaintiff should

have

> writ[ten] and complete[d] a report directly . . . [and provided t]imely notification
> to the Fire Chief . . . [o]f the actual intensity of the investigation . . . [because t]he
> investigation had serious overtones in the eyes of the Fire Chief at the time.  And
> so that should have required the Director of the division[, i.e., the plaintiff,] to
> give a briefing and a report of a thorough and complete investigation and
> everything that entailed due to the possibility of the serious overtones of the
> allegations.

Pl.'s Opp'n, ECF No. 24–5, Ex. 4 (Defendant's Deposition) at 55–56.  But, the General Order

governing "disciplinary reporting procedures" does not require the Director of the division to

prepare a separate and complete report; rather, "[o]fficers, supervisors or members shall

promptly report, in writing, apparent or alleged infractions of discipline that <u>are observed or</u>

<u>brought to their attention</u>" and they are required to "forward such reports through the chain-of-

command to the appropriate Assistant Fire Chief."  <u>See</u> Pl.'s Opp'n, ECF No. 24–6, Ex. 5

(General Order) at 3–4 (emphasis added).  As the plaintiff was the third person in the chain-of-

command, <u>see</u> Pl.'s Opp'n at 14; Def.'s Mot., ECF No. 20–3, Ex. 3 (Plaintiff's Objections and

Answers to Defendant's First Interrogatories to Plaintiff) at 13 (indicating that the plaintiff

provided the third endorsement of the investigation report), it does not appear that the plaintiff

was required to prepare a written and complete report directly pursuant to the General Order.

And, the District has not identified any policy or procedure requiring the Director of the Training

Academy to do so.  Moreover, the parties dispute when Chief Thompson learned of the

investigation and the cheating scandal, and in particular, whether he was promptly notified of the

scandal.  <u>Compare</u> Pl.'s Opp'n, ECF No. 24–5, Ex. 4 (Defendant's Deposition) at 101–02 (the

District's representative's testimony that he was not certain whether Chief Thompson was notified before or after the investigation leaked to the media or during the review and endorsement process of the Special Report addressed to him); with Pl.'s Opp'n, ECF No. 24–10, Ex. 9 ("Plaintiff's Declaration") at 2 ("Fire Chief Adrian was fully briefed on the March 30, 2006, EMT cheating scandal prior to it being addressed by the media"); and Def.'s Facts ¶ 3 ("On or about March 30, 2006, Sergeant Theresa Shanklin submitted a Special Report reporting a violation of Policies and Procedures in the Training Academy.").

Nonetheless, it was proposed that the plaintiff be demoted because he "failed to monitor and manage the Fire Cadet Program efficiently and failed to manager the documentation and tracking of [Emergency Medical Technician/Cardiopulmonary Resuscitation] records at the Training Academy." Pl.'s Opp'n, ECF No. 24–21, Ex. 20 (Memorandum dated June 26, 2006). According to the District,

> [t]his information came to light when an EMT was involved in an incident in which a patient died. It was later discovered that the EMT had provided medical care with an expired certificated prior to the incident, although at the time of the incident her certificate had been renewed. Further review of the records and certifications at the Training Academy revealed far less than desirable record maintenance.

Def.'s Mot., ECF No. 21–1 (SEALED), Ex. 3 (Defendant District of Columbia's Answers to Plaintiff's First Set of Interrogatories) at 4. However, during the disciplinary process, the Fire Chief determined "that there was insufficient evidence to sustain the charge[,] and [therefore] demotion procedures did not move forward [and the plaintiff] retained his rank as Deputy Fire Chief." Id. at 5. But, while the plaintiff retained "his rank and privileges and conditions of employment," id. at 4, the plaintiff was "reassigned to one of the other seven Deputy Fire Chief positions," id., and transferred to the Office of Risk Management because "the investigation revealed that [he] would best promote the [Department] outside of the Training Academy," id. at

23

5, and this "position was more aligned to [the plaintiff's] skills and the [Department's] needs," id. at 4.  The plaintiff asserts, albeit without any supporting evidence, that the Fire Chief "was fully aware that there was a problem with the [certifications] database at the Training Academy. And, he was fully aware that there was a problem with tracking credentials of members at the Training Academy prior to [the plaintiff] getting there as the Training Director."  Pl.'s Opp'n, ECF No. 24–2, Ex. 1 (Deposition of Michael Willis) at 195; see Def.'s Mot., ECF No. 20–3, Ex. 2 (Plaintiff's Objections and Answers to Defendant's First Interrogatories to Plaintiff) at 17.  The plaintiff also argues that the District's assertion that his transfer to "the Office of Risk Management better suited his skillset . . . fails to account for [his] promotion to the role only a year prior" and his promotion in 2002, which contradicts the District's "assertion that [the p]laintiff lacked the skillset to remain in the position."  Pl.'s Opp'n at 16–17.  However, the plaintiff did remain in the position of Deputy Fire Chief, and was only transferred to a different division within the Department.

On this record, the plaintiff has not demonstrated why the Deputy Fire Chief position at the Office of Risk Management is "an undesirable position," Pl.'s Opp'n, ECF No. 24–14, Ex. 13 (Charge of Discrimination), even though the District provides that "[n]one of the seven Deputy Fire Chief positions are less desirable, for there are thirty-six Battalion Fire Chiefs who would love a promotion to any one of the [Deputy Fire Chief] position, including the [Deputy Fire Chief] for the Office of Risk Management," Def.'s Mot., ECF No. 21–1 (SEALED), Ex. 3. (Defendant District of Columbia's Answers to Plaintiff's First Set of Interrogatories) at 4.  Nor has the plaintiff provided evidence demonstrating that his Caucasian replacement, Alfred Jefferys, was less qualified; he simply contends that the District "has not set forth the qualifications of the individual who replaced [the p]laintiff and only asserts that he was

qualified." Pl.'s Opp'n at 16.  However, as the District notes:

> [t]he only requirement for an individual to be promoted to the position of Deputy
> Fire Chief is to attain and maintain the rank of Battalion Fire Chief for two years
> preceding the promotion.   All promotions above the rank of Captain, i.e.,
> Battalion Fire Chief, Deputy Fire Chief and Assistant Fire Chief respectively are
> discretionary promotions.  The Chief Fire/EMS may at his/her discretion promote
> whomever he or she so chooses to the ranks of Battalion and Deputy Fire Chiefs.
> Chief Adrian Thompson in his capacity as The Chief of [District of Columbia]
> Fire/EMS promoted chiefs based on 1) their individual credentials as detailed [in]
> their resumes; 2) personal observations of how individual applicants handled
> command and crisis situations; and 3) recommendations from his Assistant Fire
> Chiefs.  None of the promotions were made in a vacuum and none were based on
> an individual's racial identity.

Def.'s Mot., ECF No. 21–1 (SEALED), Ex. 1. (Defendant District of Columbia's Answers to

Plaintiff's First Set of Interrogatories) at 3.

Based on this record, the Court does not find that the plaintiff has submitted sufficient

evidence for a reasonable jury to find that the District's asserted non-discriminatory reasons were

pretextual.  Without evidentiary support, the plaintiff's conclusory allegations are not sufficient

to overcome the District's assertion that the plaintiff's involvement in the cheating investigation,

in conjunction with his failure to monitor the EMT certifications database, warranted the

discipline imposed, and therefore does not defeat the District's summary judgment motion.  See

Turner v. Shinseki, 824 F. Supp. 2d 99, 118 (D.D.C. 2011) (Walton, J.) (finding summary

judgment appropriate in light of the plaintiff's conclusory allegations and opinions that he was

discriminated against based on his race); see also Galdamez v. Xerox Corp., No. 03-2326, 2005

WL 486161, at *16 (D.D.C. Feb. 28, 2005) (holding that the plaintiff's "self-serving allegations"

were insufficient to show that the employer's proffered reason for the termination was pretext for

discrimination), aff'd, 171 F. App'x 353 (D.C. Cir. 2006); Sage v. Broad. Publs., 997 F. Supp.

49, 53 (D.D.C. 1998) (observing that "[c]onclusory allegations made in affidavits opposing a

motion for summary judgment are insufficient to create a genuine issue of material fact").

Accordingly, the Court will grant the District summary judgment as to the plaintiff's discrimination claims.

## IV.     CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the District's motion for summary judgment in its entirety.

**SO ORDERED** this 26th day of October, 2016.[11]

REGGIE B. WALTON
United States District Judge

---

[11] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.